**HOWMET CORPORATION, Plaintiff,**

v.

**TOKYO SHIPPING CO., Ltd., Phoenis Cia De Nav Sa, and the Mayor and Council of the City of Wilmington, Delaware, a municipal corporation of the State of Delaware, the Board of Harbor Commissioners, an Agency of the City of Wilmington (as aforesaid) and its Commissioners, Charles E. Mendinhall, Paul Cramer and C. T. Foster, Defendants.**

Civ. A. No. 3278.

United States District Court,
D. Delaware.

Jan. 8, 1971.

Ernest S. Wilson, Jr., of Wilson & Russell, Wilmington, Del., for plaintiff.

H. James Conaway, Jr., and William F. Taylor of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendants, The Mayor and Council of Wilmington and Board of Harbor Commissioners.

## OPINION

LATCHUM, District Judge.

Howmet Corporation, a Delaware company ("Howmet"), brought this suit in admiralty to recover $31,832.04 for alleged rust damage to a shipment of 240 coils of galvanized sheet steel shipped by sea from Chiba, Japan to Wilmington, Delaware. Named as defendants were Tokyo Shipping Co., Ltd. ("Tokyo"), Phoenis Cia de Nav Sa ("Phoenis"), and The Mayor and Council of Wilmington, a municipal corporation of the State of Delaware, the Board of Harbor Commissioners,[1] an agency of the City of Wilmington, and its three Commissioners (herein collectively called "the City"). The steel coils were shipped aboard the SS "Fenix" from Japan to Wilmington. The complaint first sought recovery from Tokyo, as charterer, and Phoenis, as owner of the SS "Fenix", for breach of contract of carriage and for negligence, based upon the allegations that the rust damage occurred while the coils were aboard ship in transit under a bill of lading governed by the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq. In prior proceedings, this Court granted Tokyo's motion for summary judgment of dismissal for laches upon the finding that the action was not prosecuted against Tokyo with due diligence to the latter's prejudice. 318 F.Supp. 658. The defendant Phoenis was never served with process and has never appeared in this action.

In the alternative, the complaint sought to recover the entire amount of damages from the City based upon the allegation that the rust damage was caused by the City's negligence in leaving the coils in open storage on the pier of the Marine Terminal exposed to the weather after they were discharged in "sound condition" from the ship.[2] How-

---

1. The Board of Harbor Commissioners operates the Wilmington Marine Terminal at the Port of Wilmington.

2. The complaint in pertinent part reads: "In the alternative, on or about November 2, 1965, said cargo was discharged in sound condition into the care and custody of the City of Wilmington. Said cargo was discharged onto the open pier at the Port of Wilmington and remained there. * * *" 77 coils were removed by Howmet's trucking agent on November 10, 1965 and found to be rusty and 163 coils remained there until sometime after December 31, 1965 when they were sold by Howmet. "Defendants knew or should have known that the cargo would be damaged if left exposed to rain and air. The defendants did not store said cargo, but permitted it to remain on the pier in an exposed condition. The defendants negligently caused said coils to be exposed to rain and air causing the coils to rust." (Pars. 8(a) to 12, inclusive.)

met concedes that there is no diversity jurisdiction of its claim against the City since the opposing parties are Delaware citizens. 28 U.S.C. § 1332. However, Howmet contends that jurisdiction exists in admiralty under 28 U.S.C. § 1333. The City on the other hand maintains that this Court is without admiralty or maritime jurisdiction.

The complaint clearly demonstrates that Howmet seeks damages from the City for negligence which occurred while the cargo was stored on the pier after the cargo was discharged from the ship. Indeed, the complaint alleges that the cargo was discharged in "sound condition into the care and custody" of the City and that the rust damage occurred because it was left by the City exposed to the elements. Thus, the gravamen of the complaint is that the City by its neglect committed a maritime tort.

■ The critical factor in determining whether a tort claim comes within the statutory grant of admiralty jurisdiction is the situs of the tort, i.e., the place where it happened. State Industrial Commission of State of New York v. Nordenholt Corp., 259 U.S. 263, 271, 42 S.Ct. 473, 66 L.Ed. 933 (1922). If the tort occurred on navigable waters, the claim lies within the jurisdiction of the Court of Admiralty. Weinstein v. Eastern Airlines, Inc., 316 F.2d 758, 761 (C.A. 3, 1963), cert. den. 375 U.S. 940, 84 S.Ct. 343, 11 L.Ed.2d 271 (1963). In applying the "locality" test for admiralty jurisdiction, the tort is deemed to occur, not where the wrongful act has its inception, but where the impact of the act or omission produces such injury as to give rise to the cause of action. The Plymouth, 70 U.S. 20, 18 L.Ed. 125 (1865). The complaint here alleges that the City's negligent failure to protect the cargo occurred on the pier and not on any navigable waters. Torts which occur on a dock or wharf or any other

extension of land ordinarily are not within admiralty jurisdiction.[3] American Export Lines, Inc. v. Revel, 266 F.2d 82, 84 (C.A. 4, 1959); Swayne & Hoyt, Inc. v. Barsch, 226 F. 581, 587–588 (C. A. 9, 1915); Bird v. S.S. Fortuna, 232 F.Supp. 690, 691 (D.Mass.1964).

■ During the course of argument, Howmet suggested (although it was not alleged in the complaint) that the City "had negligently failed to notify plaintiff that Custom Clearance had been obtained" so that the goods could have been promptly removed by Howmet. Despite the failure to plead this contention, the Court has considered it and also found it insufficient to invoke this Court's admiralty jurisdiction. Any tortious failure to notify would also have occurred entirely upon land and not upon navigable waters. It, too, is outside of admiralty jurisdiction. The Court thus concludes that, in so far as the complaint asserts a claim in tort against the City, this Court lacks admiralty jurisdiction.

■ Further, if the alternative claim against the City could be construed as a cause of action for breach of a storage contract, it would still not be within the admiralty jurisdiction of this Court. It is well settled that an action for nonperformance or faulty performance of a storage contract is nonmaritime in nature and does not fall within maritime jurisdiction. Pillsbury Flour Mills Co. v. Interlake S.S. Co., 40 F.2d 439, 440–441 (C.A. 2, 1930), cert. den. 282 U.S. 845, 51 S.Ct. 24, 75 L.Ed. 750 (1930); The Czechoslovakia Victory, 76 F.Supp. 808 (S.D.N.Y.1948); Armstrong Cork Co. v. Farrell Line, Inc., 81 F.Supp. 848 (E.D.Pa.1948); Van Camp Sea Food Co. v. Pacific-Atlantic S.S. Co., 122 F.Supp. 163, 164 (E.D.Pa.1954); Gowanus Storage Co. v. U. S. Shipping Board Emergency Fleet Corp., 271 F. 528, 530 (E. D.N.Y.1921).

---

3. From the facts alleged in the complaint of this case, it is clear that the Admiralty Jurisdiction Extension Act, 46 U.S.C. § 740, is not applicable. See Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); Cf. Adams v. Harris County, Texas, 316 F.Supp. 938 (S.D.Tex. 1970).

While agreeing that these cases hold that storage contracts for cargo at voyage-end are not within maritime jurisdiction, Howmet relies upon Marubeni-Iida (America), Inc. v. Nippon Yusen Kaisha, 207 F.Supp. 418 (S.D.N.Y.1962) and Oliver J. Olson & Co. v. Marine Terminals Corp., 215 F.Supp. 490 (N.D.Cal. 1962) as expressing a contrary and more enlightened view. The Court disagrees. *Marubeni* involved a suit by a consignee of damaged goods against a carrier who impleaded the stevedore who unloaded and stored the cargo. The stevedore moved to dismiss for lack of jurisdiction. In denying the motion the Court held that to the extent that it may be proved that the goods were damaged incident to *unloading*, the carrier might be entitled to indemnification from the stevedore for breach of contract of wharfage. But the Court went on to declare that if the facts developed that the damage occurred *in storage* rather than in unloading (wharfage), admiralty jurisdiction would terminate since storage is not a maritime incident. The Court expressly stated: "It is clear that admiralty has no jurisdiction over an action for damage to cargo being held for storage purposes." 207 F.Supp. at 419.

In *Olson*, the ocean carrier, (not the consignee) sued the warehousemen and stevedores for damaged goods for which the shipper had settled with the consignee. A motion to dismiss for lack of jurisdiction was denied because the Court found "there is enough in the pleadings at bar to show all the [storage] contracts were incidental to the maritime contract between libelant and consignees." 215 F.Supp. at 492. This decision seems to be an aberration from all other decisional law on the subject. It may well be that it can be distinguished as Chief Judge Sweeney did in Bird v. S.S. Fortuna, supra, 232 F.Supp. at 692, where he said the *Olson* case "upheld admiralty jurisdiction of claims by the carrier, not the shipper or consignee of goods, against the pier operator." Whether this is a valid distinction is immaterial, however, as this Court finds *Olson* to be unpersuasive with respect to the allegations found in the present complaint.

■ At oral argument Howmet also contended that the storage of the cargo in question was an essential incident to wharfage, admittedly a maritime subject within admiralty jurisdiction. This argument, however, misconceives the meaning of wharfage and the services which it encompasses. "Wharfage" is the fee charged for the temporary use of a dock furnished in the ordinary course of navigation to a ship for the purpose of mooring in safety in order to load and unload cargo, to receive and land passengers, to make temporary repairs and to refuel, resupply and reprovision. Ex Parte Easton, 95 U.S. 68, 73, 24 L. Ed. 373 (1877); Manhattan Lighterage Corp. v. Moore-McCormack Line, 45 F. Supp. 271, 273 (E.D.N.Y.1940); Old Dominion S.S. Co. v. City of New York, 286 F. 155, 156 (S.D.N.Y.1921), aff'd 286 F. 157 (C.A. 2, 1922); The James T. Furber, 129 F. 808, 810 (D.Me.1904); 1 Benedict On Admiralty (6th ed. 1940) pp. 309–310. All of the services embraced in wharfage are intimately related to and are essential incidents to a ship in the ordinary course of navigation. As the United States Supreme Court stated in Ex Parte Easton, supra, 95 U.S. at 73: "Wharf accommodation is a necessity of navigation, and such accommodations are indispensable for ships * * * whether employed in carrying freight or passengers. * * * [Wharves] are constructed to enable ships * * * to lie in port in safety, and to facilitate their operation in loading and unloading cargo and in receiving and landing passengers."

■ Wharfage, however, does not extend to the storage of cargo, as this service is not an essential incident to navigation. Cargo may be loaded and unloaded without first being stored for any length of time on the wharf. In the instant case, according to the complaint, the cargo was unloaded on the pier on or about November 2, 1965. The voyage had then been completed, the cargo had

been discharged and all maritime services, including wharfage, had ended. Simply holding the bulk of the cargo on the pier from November 2nd until after December 31, 1965 to await removal by the consignee became a matter of inland storage with the City acting as warehouseman. This storage was entirely unrelated to navigation. From that point on, the relationship between Howmet and the City was not maritime in nature. The City was not providing the consignee with wharfage service because the extended storage, during which the alleged rust damage occurred, did "not pertain to the navigation of a ship, nor assist a vessel in the discharge of a maritime obligation." Pillsbury Flour Mills Co. v. Interlake S.S. Co., supra, 40 F.2d at 440; The Richard Winslow, 71 F. 426, 428 (C.A. 7, 1896); The Pulaski, 33 F. 383 (E.D.Mich.1888).

Finally, although this Court had admiralty jurisdiction over Howmet's first alternative claim for cargo damaged in ocean transit against the carrier Tokyo (now dismissed for laches), this claim would not confer pendant or incidental admiralty jurisdiction over Howmet's alternative and separate claim against the City for damage allegedly sustained after the cargo had been discharged from the ship and left on pier storage. To confer pendant or incidental jurisdiction, the complaint must state a "single cause of action" supported by federal and non-federal grounds, as distinguished from separate causes of action under federal and non-federal law. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). Separate causes of action are presented within the meaning of Hurn v. Oursler where the parties to the federal and non-federal claims are not identical. Pearce v. Pennsylvania R.R. Co., 162 F.2d 524 (C.A. 3, 1947), cert. den. 332 U.S. 765, 68 S.Ct. 71, 92 L.Ed. 350 (1947). Here the separate and alternative federal and non-federal causes of action are not asserted against identical defendants. Thus, no incidental or pendant jurisdic-

tion exists with respect to the claim against the City.

Accordingly, the motion to dismiss the alternative cause of action against the City will be granted on the ground that this Court lacks admiralty or maritime jurisdiction.