**PIERSIDE TERMINAL OPERATORS, INC., Plaintiff,**

**Eagle, Inc., Intervening Plaintiff,**

v.

**M/V FLORIDIAN, etc., in rem, et al., Defendants.**

**Civ. A. No. 5–73–N.**

United States District Court,
E. D. Virginia,
Norfolk Division.

Feb. 17, 1976.

G. W. Birkhead, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for Pierside Terminal and Eagle, Inc.

John R. Crumpler, Jr., Seawell, McCoy, Dalton, Hughes, Gore & Timms, Norfolk, Va., for Containerships Inc.

No appearance for FLORIDIAN and Marine & Marketing.

## MEMORANDUM OPINION AND ORDER

WALTER E. HOFFMAN, Senior District Judge.

On June 20, 1975, the Court heard argument in this case and orally permitted the amendment of its Final Pretrial Order dated April 4, 1975, so as to include as a triable issue by defendant Containerships, Inc. the

question of whether or not the alleged promise or promises now sued upon are barred by the applicable statutes of frauds, having previously indicated that such amendment should be granted. On the same day, the Court denied defendants' motion to dismiss for lack of admiralty jurisdiction, it being represented to the Court that federal jurisdiction existed on the basis of diversity of citizenship coupled with the jurisdictional amount, at least as between defendant Containerships and plaintiff Pierside Terminal Operators, Inc. For the first time, the Court was made aware that the claim of Eagle, Inc., might fall short of the required $10,000.00 amount in controversy. Consequently, this Court reserved its prerogative in vacating any order with respect to the jurisdiction sought by Eagle, Inc., as well as ruling on the precise question of admiralty jurisdiction within the purview of Rule 9(h), Federal Rules of Civil Procedure.

Rule 8(c), Federal Rules of Civil Procedure, requires pleading of statutes of frauds as an affirmative defense while Rule 12(b)(1) allows pleading by motion of the defense of lack of jurisdiction over the subject matter. We feel any doubt or criticism of this Court in granting defendant here leave to amend his answer so as to include the statutes of fraud as an additional triable issue is resolved for practical purposes by Rule 15(a), (b). Leave to amend is appropriate here since it is the discretionary judgment of this Court that "justice so requires," Rule 15(a), and since the amended answer conforms to the evidence and "the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits," Rule 15(b). We have entered an amended pretrial order with the purpose "to prevent manifest injustice" and it hence controls the subsequent course of this action. See Rule 16.

■ The addition of the statutes of frauds question does not prejudice plaintiff. It does not arise from additional evidence to which plaintiff has lodged objection. It is not outside his knowledge of the true facts; indeed it is within the facts pleaded by him, and consequently, we feel he should certainly be deemed on notice that he should be prepared to meet any claim involving it. See generally, *Moore's Federal Practice*, Vol. 3, Chapter 15, pp. 827–952, at p. 836 (2d Ed. 1948) (1974 Supp.). It is consonant with the entire spirit of the Rules to the effect that controversies shall be decided on their merits, the real issues of the case. *Ibid.*, at pp. 874–875. Leave to amend has been granted in other cases where the effect was to set up additional defenses, particularly defenses which if not pleaded might be deemed waived, including assumption of risk, fraud, ripeness, and the statutes of frauds. *Ibid.*, at pp. 888–889, note 6. Upon motion for leave to amend an answer in *Bernstein v. Gluck et al.*, 7 F.R.D. 201 (S.D. N.Y.1947), the court stated:

> The answer as it now stands, denies these allegations of the complaint.

. . . . .

> From the pleadings and the moving papers on this motion the court cannot reach a conclusion that the defense of the statute of frauds would be of *no avail to the defendants.* Reliance upon the statute of frauds as an affirmative defense must be pleaded. Rule 8(c), F.R.C.P. Whether it is a good defense *or not* depends upon the evidence offered at the trial. The Court is not satisfied that the defendants could have availed themselves *of this defense when they prepared and* served their answer and believes that the ends of justice will be best served by allowing the amendment.

7 F.R.D., at p. 202.

■ Defendant Containerships generally denied or pleaded lack of sufficient knowledge to respond to plaintiffs' allegations. The Court in the exercise of its discretion may permit an amendment which defeats jurisdiction, and in this instance we feel it is appropriate to so rule.

Now that the statute of frauds question has been allowed as a triable issue before the Court, and since that issue has been

argued, we feel a specific ruling on the existence of maritime jurisdiction over the alleged promise most appropriate, indeed preliminary, to consideration of the oral nature of the alleged promise and application of the statute of frauds. Accordingly, the Court will first address its attention to the facts as presented, the existence of admiralty jurisdiction over the claim of each plaintiff, and then rule on jurisdiction with respect to each claimant before deciding the statute of frauds issue.

While there exists a factual dispute over the occurrence and validity of an alleged oral promise between defendant and plaintiffs, the depositions in this case present a uniform set of circumstances. Containerships, Inc. is a maritime corporation owned solely by Erie & St. Lawrence Corporation, a company in which one of the principals of this case, Harry Moore, held positions in Containerships of joint founder, president and shareholder (Moore Deposition, p. 5).[1] Now the corporate president of Coastal Feeders, Inc., Moore and fellow associates of the Erie & St. Lawrence financed in 1959 a subsidiary venture, incorporated as Containerships, Inc. (Moore, pp. 7–8). Moore himself became titular president of the corporation although he was reportedly salaried only as a consultant (Moore, p. 5). At the onset, the new subsidiary acquired two vessels, THE NEW YORKER and THE FLORIDIAN, its two principal assets (Moore, pp. 7–8). The present controversy arose from events following a 1971 bareboat charter of THE FLORIDIAN to Marine & Marketing, Inc. (Moore, p. 9).

Marine & Marketing was incorporated in May, 1971, for the express and sole purpose of operating THE FLORIDIAN (Garcia, pp. 4–5). Eduardo Garcia served the new corporation as founder, vice president and general manager until August, 1971, at which time he became corporate president (Garcia, pp. 4–5). Garcia testified that there was no legal relationship between Containerships and Marine & Marketing; that no Contain-

ership officer held an interest in Marine & Marketing (Garcia, p. 35); that the Stevenson brothers who held approximately thirty per cent of Marine & Marketing stock had no relationship to Containerships (Garcia, pp. 6, 35); that Garcia himself never had any authority to act in behalf of Containerships, nor had he ever held himself out as possessing such authority (Garcia, p. 8); and that he never represented to Pierside Terminal Operators or Mr. Joey Tietelbaum that Marine & Marketing owned THE FLORIDIAN (Garcia, p. 38).

Another chief employee of Marine & Marketing, Carlos Martinez, confirmed that no representation of any agency relationship between the two companies was ever made by him (Martinez, p. 6). Marine & Marketing operated THE FLORIDIAN; it hired and paid the crew, provided the fuel, and instructed the captain as to sailing dates and ports of destination (Martinez, pp. 13–14). Marine & Marketing and Containerships appear to have been separate and distinct operations; their respective ownership and management being independent of the other.

In July, 1971, Containerships, as owner and mortgagor of THE FLORIDIAN, bareboat chartered the vessel to Marine & Marketing (see Plaintiff's Exhibit No. 1). The charterer agreed to be responsible for all operational expenses, including the following: to man, operate, navigate, fuel, supply, maintain, port, and all other expenses incident to the use and operation of the vessel (Charter, ¶4); to maintain and preserve the vessel (Charter, ¶15); to repair and overhaul, to drydock and paint (Charter, ¶6); to pay all government taxes and assessments (Charter, ¶9). Also, among those negative promises covenanted, the charterer agreed to refrain from the following without express, written consent of both the owner and the Secretary of Commerce for Maritime Affairs: to subcharter (Charter, ¶16); to enter into a merger or consolidation, or appoint an operating or managing agent for

---

1. Citations to proper names hereinafter refer to depositions of the respective persons, as incorporated into the record.

the vessel (Charter, ¶39); nor could the Charter " . . . be terminated or amended except by mutual agreement of the Owner and the Charterer and the prior written consent of the Secretary." (Charter, ¶44).

Eagle, Inc., served as port agent for THE FLORIDIAN in its dealings with Dade County and United States Government officials. Its service claim aggregated the sum of $4,725.70 (Tietelbaum, pp. 7–8). Eagle, Inc., as the parent corporation, wholly owned Pierside Terminal Operators. The relationship between the two companies was close: Emanuel Levy testified that he served as vice president of both (Levy, p. 3); Moore believed Tietelbaum to likewise hold offices in each corporation (Moore, p. 17).

Eagle and Pierside serviced THE FLORIDIAN on a weekly basis when it called at the port of Miami. Only the stevedoring contract of Pierside was reduced to writing, the purpose being to assure a firm rate schedule; Eagle's agency agreement was verbal (Tietelbaum, pp. 33–34).

The legal basis for the present controversy occurred in January or February, 1972. Plaintiff's witnesses present a conforming sequence of events: approximately $10,-000.00 worth of checks from Marine & Marketing were returned to Pierside marked "N.S.F." (Tietelbaum, p. 9; Levy, pp. 6–7); Tietelbaum called Moore and arranged to meet in New York City at the Downtown Athletic Club within a short period of time (Tietelbaum, pp. 10–12; Kessler, p. 4); a meeting did occur (Tietelbaum, pp. 14–20; Kessler, pp. 5–7; Levy, pp. 6–7); Moore offered Tietelbaum a brief assurance that Tietelbaum would be paid the debts owed to his corporations in response to Tietelbaum's suggestion that he would be otherwise forced to libel THE FLORIDIAN (Tietelbaum, pp. 15–20; Kessler, pp. 6–7; Levy, pp. 6–7); Tietelbaum, Kessler and Levy returned to Florida and the indebtedness owed to their companies was paid (Tietelbaum, p. 20). Contrary to this account, Moore denies the occurrence of the meeting and the giving of any such assurance (Moore, p. 15). Expenses incurred approxi-

mately eight or nine months after those paid in February, 1972, are the subject matter of this law suit. In fact, additional work was performed and services rendered after February, 1972, which were paid by Marine & Marketing. Subsequent checks of Marine & Marketing were dishonored in November, 1972 and, at that time, Marine & Marketing became insolvent.

Plaintiffs Eagle and Pierside argue for recovery on an oral contract of guaranty theory; one they say was continuing in effect from the alleged meeting in February, 1972, but a finding on this issue is not made by the Court. They say the Court is only confronted with a factual dispute, and that once their three depositions are placed in the scale beside one rebuttal deposition, the Court must find for them. However, this Court need not further consider the details of the meeting in New York in February, 1972, because a finding most advantageous to plaintiffs would yield the same conclusions of law; the contract sued upon is not maritime in the jurisdictional sense, Pierside is the only plaintiff that can lay claim before this Court on the basis of diversity of citizenship and the prerequisite amount in controversy, and its claim must be barred by the applicable statutes of fraud.

During the hearing before this Court on June 20, 1975, plaintiffs and defendant Containerships submitted their arguments on the above facts. In response to a question from the Court as to whether plaintiffs contend Moore made a guarantee in perpetuity, counsel responded, "It was an oral contract." Counsel argued that plaintiffs—actually Tietelbaum—agreed not to libel the vessel and to, in fact, service the vessel in exchange for Moore's promises to "make good" the dishonored checks of Marine & Marketing and to guarantee future payments for services to be subsequently rendered THE FLORIDIAN. Such an arrangement, counsel argued, was typically of "maritime flavor" so as to prevent application of any statute of frauds, just as the traditional concept of maintenance and cure sustained plaintiff's claim against similar

scrutiny in *Kossick v. United Fruit Company,* 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (N.Y.1961). Other oral contracts, typically "maritime", he argued, have been excepted from the civil statutes of frauds, relying generally: *Northern Star Steamship Co. v. Kansas Milling Co.,* 75 F.Supp. 534 (S.D.N.Y.1947); *Martran Steamship Co. v. Aegean Tankers, Ltd.,* 170 F.Supp. 477 (S.D.N.Y. 1959).

The essence of plaintiffs' argument was made in summary by counsel during the hearing:

. . . The charter party had no right [Mr. Birkhead, discussing the case of *Pacific Surety Co. v. Leatham & Smith Towing & Wrecking Co.,* 151 F. 440 (7 Cir. 1907), in rebuttal to Mr. Crumpler's argument against maritime jurisdiction] to step in and perform the charter party if the charterer did default, which is bond covered and it was simply a surety. A contract of this kind is not a maritime contract in nature. And I submit this, is quite different from the facts here. First of all, *Containerships had* a definite interest in the performance *and also a right, if it didn't perform the charter party, to come in and take the vessel* from Marine & Marketing upon default and go ahead and run it themselves, with Pierside or Eagle, or whatever they wanted. That they were intimately tied up as owners of the vessel, as mortgagors of the vessel, as having money come out of their own pockets by loss of the vessel, *they were intimately tied up in the performance, not of the charter party, but in the furnishing and payment for the stevedoring and agency services.* It is different, that's where the *Kossick* and the *Martran,* and the other cases I cited, show in these cases that there were charters involved, not the *Kossick,* and it shows it was different than if it was just some surety company . . . . (Hearing, June 20, 1975; Mr. Birkhead for plaintiffs.) (Emphasis supplied.)

Any right regarding stevedoring and agency services would be only a negative right under the Charter (See Charter, ¶¶4, 5, 6, 9, 16) running solely between the defendant and Marine & Marketing. Plaintiffs cannot benefit from it unless it was assigned or altered in some manner so as to establish a positive duty of defendant to plaintiffs.

Counsel for defendant, on the other hand, focused his attention upon the case law delineation of "maritime flavor"; that quality of a transaction which gives authority for the courts to exercise admiralty jurisdiction. His perspective of the *Kossick* case would have us find insufficient "maritime flavor" in the transaction, thus pushing the matter outside the protective nest of admiralty law and into the more general domain of general civil law with its statutes of frauds. Counsel distinguished the *Kossick* guarantee as being one for a primary debt, that is, a debt owed by one party in controversy for which the same party is ultimately and independently liable to the plaintiff litigant. This situation, he argued, is to be contrasted with the instance of a guarantee for the debt of a third party, the debt of another, a party not in present controversy. Counsel advised us that this is the very situation for which all statutes of frauds were designed. He concluded that any benefit the alleged promisor, Moore for Containerships, would receive from the contract must surely be regarded as indirect and collateral in nature, thus leaving the mandate of the statute of frauds in full force against the enforceability of such an oral contract. Upon review and consideration of the case law, we choose to agree with defendant's analysis.

First, on the nature of a maritime contract, it has long been held that if a contract relates to a ship in its use as such, or to commerce in navigable waters, such a contract is the subject of maritime law and the case is within admiralty jurisdiction, whether the performance of the contract is to occur on land or at sea. *Martran Steamship Co. v. Aegean Tankers, Ltd.,* 170 F.Supp. 477 at 478 (S.D.N.Y.1959), citing *Compania Argentina De Navegacion Dodero v. Atlas Maritime Corp.,* 144 F.Supp. 13

(S.D.N.Y.1956). But this general rule does not go without limitation:

It is generally true that a bond securing the performance of a charter party is not a maritime contract within the jurisdiction of Admiralty and that a surety company executing such bond may not be sued thereon in admiralty. *Pacific Surety Company v. Leatham and Smith Towing and Wrecking Company*, 7 Cir., 1907, 151 F. 440; *Eadie v. North Pacific S.S. Co.*, D.C.N.D.Cal.1914, 217 F. 662. In the *Pacific Surety Co.* [151 F. 441] case the court said: 'That the charter party was a maritime contract and the undertaking of the charterer was for maritime service and transactions is unquestionable. * * The appellant, however, as surety on the bond, was no party to the maritime undertaking; neither promised performance of the charter service, nor was authorized under the contract terms to perform. * * * The obligation of the appellant as surety on the bond was not for performance of the charter party, but for the payment of damages in the event of nonperformance on the part of the charterer.'

*Northern Star S.S. Co. v. Kansas Milling Co., supra,* at 535, 536.

Performance of an actual "maritime service" is required for jurisdictional "maritime flavor".

Both plaintiffs and defendant rely upon *Kossick v. United Fruit Company,* 166 F.Supp. 571 (S.D.N.Y.1957), *aff'd,* 275 F.2d 500 (2 Cir. 1960), *reversed,* 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). The district court held the New York statute of frauds precluded defendant's alleged oral promise, finding that there existed no beneficial consideration moving from the promisee to the promisor since the promisor's duty of maintenance and cure had been already discharged. *Kossick, supra,* 166 F.Supp. at 574, 577. The circuit court affirmed, noting defendant's promise that the medical care plaintiff would receive from the United States Public Health Service personnel would be comparable to the standard of care he had been receiving from a private physician was not a maritime contract since it was merely a promise to pay money, on land, if the former seaman should suffer injury at the hands of U.S.P.H.S. personnel. *Kossick, supra,* at 502. The Supreme Court reversed, finding that defendant's " . . . alleged promise was petitioner's good faith forbearance to press what he considered—perhaps erroneously—to be the full extent of his maritime right to maintenance and cure. . . . So viewed, we think that the alleged agreement was sufficiently related to peculiarly maritime concerns . . . ." *Kossick, supra,* 365 U.S. at 738, 81 S.Ct. at 892.

The Supreme Court, by its reversal, did not overthrow the path of logic and analysis decided below. Quite to the contrary, it found as sufficient consideration the forbearance in the mind of the plaintiff to demand a traditional maritime right. Excepting the Court's recognition of this right as consideration sufficient for a valid oral contract, the lower courts' opinions remain instructive. The following excerpts are helpful in deciding the case at hand:

Absent a primary obligation, i. e., a duty on the part of one another than the party proceeded against, for which the said party undertakes to be answerable, the Statute of Frauds cannot be invoked. *Lilyan-Realty Corp. v. Gottfried Baking Co.,* S.Ct., 1944, 49 N.Y.S.2d 942; 2 Williston, Contracts § 454 (rev.ed. 1936); Simpson, Suretyship § 35 (1950). The words 'debt, default or miscarriage' as employed in the Statute embrace all types of primary obligations and duties recognized by law . . . .

· · · · ·

Where the promisor comes under an independent duty of payment irrespective of the liability of the principal debtor and the undertaking is founded on a new consideration moving to the promisor and beneficial to him, the undertaking is said to be 'original', whereas if it is to answer for the debt, default or miscarriage of another it is characterized as 'collateral'.

In *Bulkley v. Shaw*, 1942, 289 N.Y. 133, 137, 44 N.E.2d 398, 400, the Court of Appeals set out the test as follows:

'The elements of beneficial interest and new consideration must be present to take the case out of the statute; *but the inquiry remains whether the consideration is such that the promisor thereby comes under an independent duty of payment, irrespective of the liability of the principal debtor.*' [Emphasis by the court.]

There are two requirements each of which must be satisfied to take an oral promise out of the statute; first, the defendant's promise must be based upon a consideration which moves to the defendant and benefits him, and secondly, the defendant must be under an independent duty of payment irrespective of the liability of the principal debtor. . . . [Citing cases]

In order to satisfy the first requirement it is not enough to show that there was consideration for the promise because without a promise otherwise enforceable the question of the applicability of the Statute of Frauds is not reached. . . . [Citing cases] The consideration moving to defendant must confer a direct and substantial benefit upon him. . . . [Citing cases] a mere detriment to or forbearance by the promisee . . . [Citing cases] or a moral or sentimental object . . . [Citing cases] or slight and indirect possible advantages will not suffice.

*Kossick, supra,* 166 F.Supp. at pp. 574–576.

The Supreme Court found sufficient consideration in plaintiff's forbearance to press the long-held, sacrosanct maritime right of maintenance and cure. There existed an unquestionable right of the plaintiff to demand a duty owed by the defendant in that case. Recovery there was effected on the duty-right relationship between the litigants.

However, on the facts of the instant case, there is no maritime duty of defendant here, with no concomitant right of plaintiffs under maritime law. Indeed, the private charter speaks against it. There is no maritime obligation running between the defendant promisor and plaintiff promisee unless there was a contract to actually provide services, a fact unsupported by the pleadings and evidence in this case. The district court in *Kossick, supra,* went further to quote 2 Williston, Contracts, § 475, i. e., Is the new promisor a surety? As cited with approval in *Bulkley v. Shaw,* 289 N.Y. 133, 44 N.E.2d 398 (1942), the district court in *Kossick* said:

If, as between the promisor and the original debtor, the promisor is bound to pay, the debt is his own and not within the statute. *'Contrariwise if as between them the original debtor still ought to pay, the debt cannot be the promisor's own and he is undertaking to answer for the debt of another.'* [Emphasis by the court.]

166 F.Supp. at p. 576.

There is nothing in our record to suggest that Marine & Marketing was relieved of its obligation to pay. Owner Containerships could not be independently held answerable for the debts of its bareboat charterer.

In the course of assuring payment for the debts incurred by Marine & Marketing, Containerships made no more than an oral third party guaranty, one void of any maritime duty-right relationship. It is upon this fact which the case turns: Containerships purportedly offered assurance by promising to answer for the debts of another, without regard to any direct, independent responsibility for those debts. Defendant is brought before us as a stranger to the maritime contracts of stevedoring and agency between plaintiffs and the original debtor, Marine & Marketing.

■ A contract of indemnity, even where it be for default in the performance of a maritime service, is not essentially maritime in character since it cannot, by definition, "relate to a ship in its use as such." *See,*

*Black Sea State S.S. Line v. Association of Int. Tr. Dist.,* 95 F.Supp. 180 (S.D.N.Y. 1951); *Northern Star S.S. Co. v. Kansas Milling Co., supra; Pacific Surety Co. v. Leatham & Smith Towing & Wrecking Co., supra.* It would be more correct to state that such a contract relates to the commercial transaction of a maritime matter, in essence one step removed from the jurisdictional subject. Performance would be tendered in the amount of security offered and accepted by the parties, not in terms of the secured subject matter, however quantitatively measured by its worth. Such an indemnity would have only quantitative reference to a maritime matter, not "maritime flavor" which we take as a qualitative prerequisite to jurisdiction.

■■■ It is the opinion of this Court that the coincidence here of the alleged guarantor also being in fact the owner of the vessel to which services were extended is of no jurisdictional consequence, and accordingly, we give no legal significance to this fact. Admittedly, Containerships could be elevated from the status of a non-maritime third party to a maritime party for jurisdictional purposes if it could be established that defendant, by Moore's alleged promise, assumed the charterer's obligation and responsibility under the Charter Party to secure such maritime services. But there is no evidence that establishes any intention, on the part of Moore or Tietelbaum, during the alleged New York meeting, that Containerships assumed this role as charterer of the vessel. Even if this had been clearly the case, there is great doubt as to whether such a major amendment to the Charter Party would be valid without the prior written consent of the Secretary of Commerce for Maritime Affairs (*See,* Charter Party, ¶¶4, 5, 6, 9). Lastly, there is no evidence of a payment arrangement that would transform Marine & Marketing from mere bareboat charterers to agents of Containerships, or joint venturers with Containerships. There being no evidence of a previous direct or indirect payment by Containerships through Marine & Marketing,

we find no more than a mere oral assurance of payment, and consequently the matter sued upon must remain outside the pale of admiralty jurisdiction.

Plaintiff Pierside Terminal Operators, Inc. brings an aggregate claim of $26,-793.18, and having previously found diversity of citizenship between itself and Containerships, the Court can exercise federal jurisdiction over the controversy. Plaintiff Eagle, Inc., with its total claim of $4,725.70, falls short and this Court cannot adjudicate its claim.

■■■ For purposes of the Erie-Tompkins rule, the applicability of the statutes of frauds are "substantive". *Macias v. Klein,* 203 F.2d 205 (3 Cir. 1953), *cert. denied sub nom., Macias v. Oakland Truck Sales, Inc.,* 346 U.S. 827, 74 S.Ct. 47, 98 L.Ed. 352 (1953). The New York statute in effect at the time the alleged contract was made reads:

§ 5–701. *Agreements required to be in writing*

Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime;

2. Is a special promise to answer for the debt, default or miscarriage of another person;

.     .     .     .     .

McKinney's Consolidated Laws of N. Y., Book 23A, General Obligations Law (1964) [Includ. 1975 amend.]

The Florida statute in effect when the services were substantially rendered and payment due reads similarly:

§ 725.01 *Promise to pay another's debt, etc.*

No action shall be brought whereby to charge any executor or administrator

upon any special promise to answer or pay any debt or damages out of his own estate, or whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person . . . , or upon any agreement that is not to be performed within the space of one year from the making thereof, unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by him thereunto lawfully authorized.

Fla.Stat.Ann., Vol. 20A (1969) [Includ. through Sp. Session of 1974]

There can be no doubt but the claim of plaintiff Pierside Terminals, Inc. is barred from consideration of this Court.

From the above findings of fact and conclusions of law, it is hereby ORDERED, ADJUDGED and DECREED that the claim of Eagle, Inc. be DISMISSED as being without the admiralty and civil jurisdiction of this Court.

Further, it is ORDERED, ADJUDGED and DECREED that the claim of Pierside Terminal Operators, Inc. be DISMISSED from consideration under the admiralty jurisdiction of this Court. While general civil jurisdiction is extended on the basis of diversity of citizenship and the prerequisite jurisdictional amount, it is further ORDERED, ADJUDGED and DECREED that such claim be DISMISSED WITH PREJUDICE as an alleged transaction regarded as void under the applicable statutes of frauds.