**FORD MOTOR COMPANY, Plaintiff,**

v.

**WALLENIUS LINES, M/V ATLANTIC CINDERELLA, her engines, boilers, etc., Motorships, Inc., Ramsey Scarlett & Co., Inc., Nacirema Operating Co., Inc., GAB Business Services, Inc., Portsmouth Terminals, Inc., Maryland Undercoating Company, Defendants.**

Civ. A. No. 79-464-N.

United States District Court,
E. D. Virginia,
Norfolk Division.

Sept. 28, 1979.

L. B. Cann, III, Hunton & Williams, Richmond, Va., for plaintiff.

Charles F. Tucker, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for Wallenius Lines, Motorships, Inc., Ramsey Scarlett & Co., Inc.

John R. Crumpler, Jr., Seawell, McCoy, Dalton, Hughes, Gore & Timms, Norfolk, Va., for Nacirema Operating Co., Inc.

Frank B. Miller, III, Sands, Anderson, Marks & Miller, Richmond, Va., for GAB Business Services, Inc.

Guilford D. Ware, Crenshaw, Ware & Johnson, Norfolk, Va., for Portsmouth Terminals, Inc.

Allan S. Reynolds, White, Reynolds, Smith & Winters, Norfolk, Va., for Maryland Undercoating Co.

## MEMORANDUM OPINION

CLARKE, District Judge.

This matter comes before the Court on defendant GAB Business Services, Inc. (GAB) Motion to Dismiss pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure. GAB contends that the Court has no jurisdiction over GAB, either through its admiralty jurisdiction or under the doctrine of pendent jurisdiction. Ford has countered GAB's contentions with the argument that GAB and Ford were parties to a contract for an essential maritime service—cargo damage inspection—thereby invoking the admiralty jurisdiction of the Court. Ford alternatively argues that even if admiralty jurisdiction is lacking over Ford's claim against GAB, the Court should exercise its pendent jurisdiction because Ford's claim against all defendants in the case, including GAB, arises from a common nucleus of facts that are so intertwined as to logically require adjudication in one lawsuit. The Court has reviewed the briefs submitted, has referred to the authorities cited therein, and will address the jurisdictional question after briefly summarizing the facts of the case that are pertinent to a determination in the matter.

### Factual Background

Ford imports Ford Fiesta automobiles, that are manufactured in Saarlious, Germany, into eight ports in the United States, including the Portsmouth Marine Terminal in Portsmouth, Virginia. On arrival in port at Portsmouth, the stevedore removes the cars from the vessel and drives them to their first point of rest in a wharfing area. The vehicles are then inspected for damage and cleared through customs before Ford's consignee takes possession of the Fiestas. The damage and custom inspections are carried out off the vessel at the first point of rest in the wharfing area.

In this case, 585 Fiestas arrived in Portsmouth on Saturday, April 22, 1978, and were off loaded from the vessel by the stevedore, Nacierma Operating Co. GAB, a company which performs damage surveys for Ford, began performance of the survey on Monday, April 24, 1978. GAB was required by its contract with Ford to notify Ford of two events: (1) confirmation of arrival time and the name of the vessel, and (2) completion of the damage survey with a list of vehicles having certain damage greater than $75.00 per vehicle. This notification was to be done by telephone. GAB did not notify Ford of the arrival of the Fiestas on April 22, 1978, and notified Ford by telephone at the end of the business day on April 25, 1978, of the completion of the damage survey.

In the afternoon and evening of April 25, 1978, a northeaster storm formed off the coast of Virginia and North Carolina, with effects of the storm being felt in Portsmouth that day. Ford contends that the early "weather reports had predicted the path and probable severity of the storm." Complaint at ¶ 17. Despite efforts on the morning of April 26, 1978, by the consignee, Maryland Undercoating Company, to move the cars to a point of safety from the rising waters, Ford claims that "[a]ll of the 585 Fiestas were contaminated by salt water," with approximately 146 of the vehicles becoming a total loss and with the remaining 439 vehicles requiring repairs. Complaint at ¶ 19.

In an action to recover this alleged loss, Ford Motor Company, a Delaware corporation with its principal place of business in Dearborn, Michigan, has joined as defendants the shipping line, Wallenius Lines, a Swedish corporation with its principal place of business in Stockholm, Sweden; the ship, M/V ATLANTIC CINDERELLA, owned by Wallenius Lines with a home port in Breman, Germany; the general eastern United States agent for Wallenius Lines, Motorships, Inc., a New Jersey corporation; Motorships, Inc.'s Tidewater Virginia representative, Ramsey Scarlett & Co., Inc., a Maryland corporation with its principal place of business in Baltimore, Maryland; Nacierma Operating Co., Inc., the stevedoring company, which is a New York corporation with its principal place of business in New York, New York; the marine surveyor, GAB Business Services, Inc., a Delaware

corporation with its principal place of business in New York, New York; Portsmouth Terminals, Inc., a Virginia corporation with its principal place of business in Portsmouth, Virginia; and the consignee, Maryland Undercoating Company, a Maryland corporation with its principal place of business in Baltimore, Maryland. Ford relies upon various jurisdictional grounds of this Court with respect to these defendants, but, in particular, Ford asserts that the doctrine of pendent jurisdiction permits the Court, in the same proceeding, to hear all of the claims against all of these defendants, including GAB, arising out of the foregoing summarized sequence of events. Also, Ford specifically claims admiralty or maritime jurisdiction under 28 U.S.C. § 1333 against defendant GAB.

## Admiralty Jurisdiction

Ford asserts two theories of recovery against GAB: one for breach of contract arising from GAB's contractual duty to notify Ford of the vessel's arrival and the completion of the damage survey, and the other for the tort of negligently failing to notify Ford and Ford's consignee of the completion of the survey. Complaint at ¶¶ 44, 45, 46. This Court is of the opinion, however, that it lacks admiralty jurisdiction under either theory of recovery.

Admiralty jurisdiction over maritime torts has traditionally been determined by looking to the situs of the tort, i. e., the place where the tort occurred. *See, e. g., Executive Jet Aviation v. City of Cleveland,* 409 U.S. 249, 253, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972);[1] *Lassiter v. United States Lines, Inc.,* 370 F.Supp. 427 (E.D.Va.1973); Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3676 (1976)

(numerous cases cited therein). "If the wrong [took place] on navigable waters, the action is within the admiralty jurisdiction; if the wrong occurred on land, it is not." *Executive Jet Aviation v. City of Cleveland, supra,* 409 U.S. at 253, 93 S.Ct. at 497. The tort of which Ford complains, GAB's negligent failure to timely notify of the completion of the survey, occurred on land after the cars had reached the first point of rest, and not on navigable waters. *See* Complaint at ¶¶ 15, 18, 19, 44, 45, 46. Accordingly, this Court lacks admiralty jurisdiction over the alleged tort.

In its brief opposing GAB's Motion to Dismiss, however, Ford primarily relies on the Court's admiralty jurisdiction over the contract claim. While the Court agrees with plaintiff's assertion that the location of the breach, whether it occurs on land or on sea, is irrelevant to maritime contract jurisdiction, *Kossick v. United Fruit Co.,* 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1960), the Court must first look to the nature and subject matter of the contract to determine if admiralty jurisdiction exists in the first instance. *Sanderlin v. Old Dominion Stevedoring Corp.,* 385 F.2d 79 (4th Cir. 1967). The inquiry "is whether the transaction relates to ships and vessels, masters and mariners, as the agents of commerce." *Kossick v. United Fruit Co., supra,* 365 U.S. at 736, 81 S.Ct. at 890, *quoting,* 1 Benedict, *Admiralty,* 131, as currently set forth in 1 *Benedict on Admiralty* § 183 (7th ed. 1977). Moreover, under this standard, the place of performance is not controlling since contracts which relate to ships in their use as ships or to commerce or transportation in navigable waters are clearly maritime contracts regardless of

---

1. The traditional "strict locality" test, requiring only that the tort have occurred on navigable waters to confer admiralty jurisdiction, was somewhat abrogated in *Executive Jet* by the Court's determination that locality, without more, did not necessarily provide the basis for admiralty jurisdiction. Rather, the Court suggested that an initial determination should also be made as to whether there was a nexus between the tort and a traditional maritime activity. The lower federal courts have accord-

ingly interpreted *Executive Jet* to require a "locality plus" test; the tort must not only occur on navigable waters, but it must also have some nexus with a maritime activity. *See* Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3676 (1976) (cases cited therein). Since the alleged tort in this action occurred on land, the Court need not proceed with an analysis of the nexus requirement of *Executive Jet.*

whether the contract is to be performed on land or sea. *Pierside Terminal Operators, Inc. v. M/V Floridian*, 423 F.Supp. 962, 967 (E.D.Va.1976). The controlling factor, referred to by the Court in *Pierside* as a "qualitative prerequisite" to admiralty contract jurisdiction, is whether the contract has a "maritime flavor." *Id.* at 970. The Court delineated "maritime flavor" as: "Performance of an actual 'maritime service' is required for jurisdictional 'maritime flavor'." *Id.* at 968.

■ Both Ford and GAB rely in their briefs upon the "maritime flavor" test of *Pierside Terminal Operators, Inc. v. M/V Floridian, supra.* Ford claims that the contract in question had such a "maritime flavor," while GAB contends that it did not. Since a determination of the "maritime flavor" of a contract must be done on a case-by-case basis, the Court has carefully examined the nature of the contract between Ford and GAB, concluding that it lacks the requisite "maritime flavor" to confer admiralty jurisdiction.

The contract in question was one concerning cargo damage inspection before acceptance by the consignee. Performance of the contract took place after the voyage was completed and after the cargo had been removed from the vessel and taken to the first point of rest in the wharfing area. The contract between GAB and Ford had no relation to furthering the transportation of the cargo by the ship and was performed at a time when the ship was not engaged in commerce or navigation, or in the preparation for voyage or the actual unloading of cargo. The contract did not involve a maritime service, one which related to the operation, navigation, and management of a ship. *See* 1 *Benedict on Admiralty*, § 183 (7th ed. 1977). Plaintiff has argued, however, that the post-voyage damage survey is essential to Ford's importation of cars in that Ford must be aware of what damage occurred in transit in order to protect any damage claim which Ford might have before the goods pass to the consignee. While protection of Ford's damage claim may be an essential service to Ford, it is not essential, or even incidental, to the accomplishment of the voyage itself.

■ The Court reminds Ford that it has the burden of showing that jurisdiction does, in fact, exist. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1935); *Bowman v. White*, 388 F.2d 756 (4th Cir. 1968). Plaintiff has cited numerous cases in support of the contention that this damage survey contract involved an essential, or at least an incidental, maritime service. Although the Court does not take exception to these cases cited, none are on point with the present case. For example, the Court agrees that the loading and unloading of cargo have traditionally been considered maritime services, *e. g., Seas Shipping Co., Inc. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and that stevedoring contracts have long been considered maritime in nature, *e. g., American Stevedores, Inc. v. Porello*, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011 (1946). The contract in question, however, does not involve loading, unloading, or a stevedoring service.

The two cases primarily relied upon by Ford are *Constantine v. The Schooner River Queen*, 2 F. 731 (S.D.N.Y.1880), and *Coast Wrecking Co. v. Phoenix Ins. Co.*, 7 F. 236 (E.D.N.Y.1881). Although both of these cases involved damage surveying services, the services were in a context quite different from the current case. In *The Schooner River Queen*, the cargo inspection was the responsibility of the carrier. The contract of affreightment required the vessel owner to weigh, inspect, and measure the cargo before delivery. Although the actual weighing, inspection, and measuring was contractually delegated by the carrier to another, *the responsibility for the inspection remained with the carrier.* Moreover, the vessel owner was challenging the Court's admiralty jurisdiction. *Coast Wrecking Co. v. Phoenix Ins. Co., supra,* likewise involved a situation in which "the ship-owner continued to be responsible for the preservation, care, and safe custody of the cargo until it was accepted by the consignees . . . ." 7 F. at 241.

The case now before the Court is clearly distinguishable from *The Schooner River Queen*, and *Coast Wrecking Co.* Ford has not alleged that the damage inspection performed by GAB was the responsibility of the carrier, Wallenius Lines. Rather, the damage inspection was performed pursuant to a separate contract between Ford and GAB and was Ford's manner of protecting its interest in possible claims against the carrier for damaged cargo. The contract was not part of the carrier's maritime services.

■ Although no case relied upon by the parties is directly on point with the present factual situation, *Howmet Corp. v. Tokyo Shipping Co.*, 320 F.Supp. 975 (D.C.Del. 1971), involves a somewhat analogous situation. The Court in *Howmet Corp.* held that a cause of action for breach of a storage contract was not within the Court's maritime jurisdiction. *Id.* at 977. The voyage was completed, and the Court reasoned that the cargo merely was being stored, even if still on the pier awaiting pickup by the consignee, and such storage was not an essential incident to the navigation and voyage of the ship or to the discharge of any maritime obligation. *Id.* at 978–79. In the present case, the voyage was over, the cargo was unloaded, and the contract in question was between Ford and GAB for damage inspection before acceptance by the consignee. All maritime services had ended. Accordingly, the contract between Ford and GAB did not have sufficient "maritime flavor" to confer admiralty jurisdiction on this Court.

### Pendent Jurisdiction

■ The doctrine of pendent jurisdiction is recognized in the federal courts to allow the adjudication of state law claims over which there is no independent ground for federal jurisdiction. A unanimous Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), set forth the current test:

> Pendent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ," U.S.Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case." . . . The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in the federal courts to hear the whole.

383 U.S. at 725, 86 S.Ct. at 1138 (footnotes omitted).

■ The *Gibbs* "common nucleus of operative facts" test changed the "cause of action" test of *Hurn v. Oursler*, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933),[2] and broadened the doctrine of pendent jurisdiction. Moreover, even though the federal court has the power to adjudicate the entire controversy in one lawsuit when a common nucleus of facts exist between a substantial federal claim and a state claim, the exercise of pendent jurisdiction remains discretionary with the court, taking into considera-

2. The *Hurn* "cause of action" test allowed the federal courts to exercise pendent jurisdiction over a state claim if a plaintiff presented "two distinct grounds," one state and one federal, "in support of a single cause of action." However, if plaintiff's assertions constituted "two separate and distinct causes of action," the federal court only had jurisdiction over the federal "cause of action." 289 U.S. at 245–46, 53 S.Ct. at 589. Application of the *Hurn* identity of cause of action test created difficulty and confusion in the courts, and the test was changed by the Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), in favor of a less restrictive approach. For a discussion of the evolution of pendent jurisdiction and the changes occasioned by the *Gibbs* decision on the earlier *Hurn* test, *see generally Aldinger v. Howard*, 427 U.S. 1, 6–16, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1975); Wright, Miller, & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3567 (1975); 3A *Moore's Federal Practice* ¶ 18.07 (2d ed. 1979).

tion "judicial economy, convenience and fairness to litigants." *United Mine Workers v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. Therefore, under the *Gibbs* standard, the Court must be satisfied that a substantial federal claim is involved in the case, that the state and federal claims arise from a common set of facts, and that the power to adjudicate should be exercised after weighing such factors as conservation of judicial time and fairness to the parties.

■ In applying the *Gibbs* standard, the Court has no difficulty in finding a substantial federal claim involved in the present case. In considering the substantiality of the federal claim for pendent jurisdiction purposes, the possible final disposition of the case is immaterial because the determination is made on the basis of the pleadings, not upon the ultimate evidence. *See Rumbaugh v. Winifrede R. R. Co.*, 331 F.2d 530 (4th Cir.), *cert. denied*, 379 U.S. 929, 85 S.Ct. 322, 13 L.Ed.2d 341 (1964). Four federal jurisdictional bases are asserted in the Complaint for the remaining claims against the defendants, other than GAB: 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (federal commerce) because the allegations in Count I partially arise under the Harter Act, 46 U.S.C. §§ 190 *et seq.*, and the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300 *et seq.*; 28 U.S.C. § 1333 (admiralty) for the claims asserted in Counts I, II, III, IV, V, and VII; and 28 U.S.C. § 1332 (diversity) for the claims asserted in Counts II, III, IV, V, and VII. With the exception of diversity,[3] the asserted bases of federal jurisdiction will clearly support a pendent state claim.

Secondly, all claims in the Complaint, including the claim against GAB in Count VI,

arise from "a common nucleus of operative facts," as detailed in the *Factual Background* in this Opinion. Ford's alleged loss was occasioned by a sequence of events beginning with the arrival of the Fiestas on the M/V ATLANTIC CINDERELLA on April 22, 1978, and continuing through the northeaster storm until April 26, 1978. The facts underlying the alleged occurrence of the loss are common to each count in the Complaint.

Finally, a state court trial against GAB would duplicate the evidence and the case presented by Ford in federal court. The same witnesses would have to be called in both trials. Ford "would ordinarily be expected to try [all of the claims] in one judicial proceeding." *United Mine Workers v. Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138. Although some facts will be peculiar to GAB, there remains substantial overlap of evidence and facts underlying Ford's claims against all defendants. Moreover, the issue of damages to the Fiestas will almost be identical with respect to each claim; it is in GAB's interest, as well as the other defendants', to have the Court determine the duties, whether contractual or imposed by law, of all the parties with respect to the allegedly damaged Fiestas in one proceeding. Therefore, considerations of judicial economy and of fairness and convenience to the litigants mandate that all of Ford's claims against all of the defendants named in the Complaint be determined in a single lawsuit.

■ Although the *Gibbs* test criteria have been met in this case to allow the exercise of pendent *claim* jurisdiction, the Court must still decide whether it can exercise pendent *party* jurisdiction over GAB.[4]

---

**3.** The problem with diversity as a basis of federal jurisdiction arises when a pendent state claim is asserted against a non-diverse third party, i. e., a party not already in the lawsuit. *See* discussion in text of pendent party jurisdiction, *infra*, for full consideration of the matter.

**4.** While *Gibbs* changed the *Hurn* "cause of action" test, the holding in *Gibbs* did not address the question of pendent *party* jurisdiction. *Gibbs* involved pendent jurisdiction of a state claim between the same plaintiff and defendant

as were involved in the federal claim. Although many lower courts have applied the *Gibbs* test to pendent party jurisdiction situations, the reach of *Gibbs* and the distinction between pendent claim jurisdiction and pendent party jurisdiction was specifically recognized by the Supreme Court in *Moor v. County of Alameda*, 411 U.S. 693, 713–15, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). Accordingly, this Court undertakes a two-step analysis: (1) a determination of pendent claim jurisdiction under the *Gibbs* test, and (2) a determination of

GAB is not a party to any of the federal claims and contends that the Court cannot exercise pendent jurisdiction over a state claim unless that state claim party is *already* in the lawsuit in regard to the federal claims. GAB relies on *Parker v. W. W. Moore & Sons, Inc.*, 528 F.2d 764 (4th Cir. 1975), in which the Court stated:

> [T]he pendent jurisdiction doctrine . . . was designed to extend federal jurisdiction to encompass pendent state claims against defendants already in the case to defend the primary federal claims. *It was not designed to bring into the diversity jurisdiction claims between parties who are citizens of the same state.*

528 F.2d at 766 (emphasis added). *See also Kenrose Mfg. Co. v. Fred Whitaker Co.*, 512 F.2d 890 (4th Cir. 1972).

This Court points out that the *Parker* decision involved a refusal by the Fourth Circuit to extend pendent jurisdiction to encompass state claims between citizens of the same state when the anchor federal claim was based on diversity jurisdiction. Such a narrow holding has been recently approved by the Supreme Court in *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) (diversity jurisdiction not basis for pendent jurisdiction over a non-diverse third-party defendant). However, when the anchor federal claims are not based solely upon diversity jurisdiction but upon other federal grounds, as in this case federal question, federal commerce, and admiralty jurisdiction, the courts have recognized pendent party jurisdiction. *See Moor v. County of Alameda*, 411 U.S. 693, 713, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973) (dictum) and cases cited n.29; *Stone v. Stone*, 405 F.2d 94 (4th Cir. 1968); *Wood v. Standard Products Co., Inc.*, 456 F.Supp. 1098, 1102 (E.D.Va.1978). *Cf. Aldinger v. Howard*, 427

U.S. 1, 12–18, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1975) (pendent party jurisdiction requires careful reading of federal statute conferring jurisdiction).

Although the Supreme Court in *Aldinger v. Howard, supra*, required "careful attention" to the federal statute conferring jurisdiction before the federal court exercised pendent party jurisdiction, the case involved a claim under 42 U.S.C. § 1983, and the Court specifically left the decision of whether to exercise pendent party jurisdiction in other situations within the discretion of the courts:

> There are, of course, many variations in the language which Congress has employed to confer jurisdiction upon the federal courts, and we decide here only the issue of so-called "pendent party" jurisdiction with respect to a claim brought under §§ 1343(3) and 1983. Other statutory grants and other alignments of parties and claims might call for a different result.

427 U.S. at 18, 96 S.Ct. at 2422.[5]

This Court exercised its discretion in favor of pendent party jurisdiction in *Wood v. Standard Products Co., Inc.*, 456 F.Supp. 1098 (E.D.Va.1978) (Warriner, J.), a post-*Aldinger* case. In *Wood*, the anchor federal claim was based on admiralty jurisdiction in an action by a fisherman against his employer for the fish slime infection he contracted when the employer failed to provide protective gloves; the Court then exercised pendent jurisdiction over the state law malpractice claim against the treating physician.

In this case now before the Court, none of the jurisdiction conferring statutes, other

---

pendent party jurisdiction under subsequent court guidelines as detailed in text, *infra*.

**5.** Since the *Aldinger* decision, the Supreme Court has addressed the question of pendent party jurisdiction only in *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). As discussed in text, *supra*, the Court in *Owen* did not permit diver-

sity jurisdiction to be a basis for pendent party jurisdiction. Since this case now under consideration involves three other bases of jurisdiction (federal question, federal commerce, admiralty), this Court will proceed to exercise its discretion under the *Aldinger* guidelines.

than diversity jurisdiction, counsel against the exercise of pendent jurisdiction, and the issues and chain of events are certainly more intertwined and common than those in *Wood v. Standard Products Co., Inc., supra.* Furthermore, in the present case, the identity of the Fiesta damage claim against all defendants, as well as the same sequence of events leading to the alleged damage, would require the duplication of the federal trial in the state court. Therefore, in consideration of the statutes upon which the anchor federal claims are based and in consideration of judicial economy, pendent party jurisdiction will be exercised over defendant GAB.

In summary, although the Court lacks maritime tort or contract jurisdiction over Ford's claim against GAB, the Court will exercise pendent jurisdiction over the claim against GAB as set forth in Count VI of the Complaint.