no special expertise," the expertise of the FAA would not aid in the disposition of plaintiffs' federal antitrust claim. *Id.* at 549. Third, neither party has made a prior application to the FAA for analysis or comment regarding the baggage templates. Thus, resolution of this matter would not frustrate legitimate agency proceedings. Finally, judicial disposition of plaintiffs' antitrust claim does not raise any substantial danger of inconsistent rulings. Accordingly, defendants' motion to dismiss under the doctrine of primary jurisdiction must fail.

An appropriate order has been issued.

Rice Arthur Jett, Jr., Philip Norton Davey, Davey & Brogan, P.C., Norfolk, VA, for plaintiff.

William Delaney Bayliss, Williams, Mullen, Clark & Dobbins, Richmond, VA, for defendants.

John **FERNANDEZ**, III, Plaintiff,

v.

James B. **HAYNIE**, etc., et al., Defendants.

No. Civ.A. 4:00CV9.

United States District Court, E.D. Virginia, Newport News Division.

Nov. 14, 2000.

### *OPINION AND ORDER*

DOUMAR, District Judge.

This matter is before the Court on Defendants James B. Haynie's ("B.Haynie"), James K. Hanie's ("K.Haynie"), and U.S. Enterprises, L.C.'s ("U.S.Enterprises") Motion to Dismiss for Lack of Subject Matter Jurisdiction. For the reasons set forth herein, the motion is **DENIED**.

### I. *Factual and Procedural Background*

Plaintiff John Fernandez, III ("Fernandez") brought this suit to redress losses incurred resultant to an alleged breach of a contract to procure and maintain marine insurance. Fernandez allegedly contracted with U.S. Enterprises and its brokers/employees, B. Haynie and K. Haynie, to place and maintain with a solvent underwriter an insurance policy on Fernandez's shrimping vessel, the F/V CAPTAIN LYMAN. Fernandez submitted an application for marine insurance to B. Haynie and K. Haynie, and also paid his monthly insurance premiums to them.

On or about August 1, 1997, B. Haynie, K. Haynie, and U.S. Enterprises—collectively doing business as both "Financial Solutions" and "U.S. Vessels"—bound and delivered a marine insurance policy, ostensibly with "United International Limited" and bearing Policy Number VIN97089341 (hereinafter the "United International policy"), to Fernandez and the F/V CAPTAIN LYMAN. The policy covered losses to hull and machinery as well as protection and indemnity risks up to $250,000. The term of this policy was August 1, 1997 to August 1, 1998.

Fernandez faithfully paid the monthly premiums on the policy. Shortly before February 1, 1998, however, without approval from or consultation with Fernandez, B. Haynie and K. Haynie allegedly switched Fernandez's insurance coverage from the policy with "United International Limited" to a new policy ostensibly with "LIC Liberty Insurance Co. A.V.V." (hereinafter the "LIC Liberty policy"). This new policy, bearing Policy Number VIN97089341, was ostensibly on the same terms and conditions as the United International policy. Fernandez was first advised of the change in his insurer on March 2, 1998 when he received a letter from Defendant Tommy Hill ("Hill"), the Managing Director of U.S. Vessel Services Inc. ("U.S.Vessels"), an entity that Fernandez alleges to be the alter ego of both Hill and LIC Liberty.

Meanwhile, on February 1, 1998, Seaman Chauncey A. Pitts ("Pitts") suffered an accident on board the F/V CAPTAIN LYMAN while commercial shrimping in the Gulf of Mexico. As a result of that accident, Pitts suffered a fracture of the left ulna [1] and was taken to the hospital for evaluation and surgery. Pitts was expected to recover within four to six weeks, and Fernandez paid Pitts unearned wages and maintenance, plus an additional $40 for prescription drugs, for the period in which he was expected to be out of work. On March 3, 1998, however, Pitts was diagnosed with osteomyelitis [2] of the fractured left arm, a condition that Pitts claims is related to the accident. On March 6, 1998, under the instruction of and with funds advanced from U.S. Vessels, Fernandez negotiated a release of all claims with Pitts in exchange for $2,500 in cash and a promise to pay Pitts's outstanding medical bills. After Pitts's settlement with Fernandez, Pitts was incarcerated for possession of crack cocaine and was subsequently diagnosed with brain abscesses, which Pitts claims are related to his left-arm fracture and have caused him to incur $88,181.60 in medical expenses.

On September 8, 1998, Pitts filed suit against Fernandez in Florida state court, alleging claims of Jones Act negligence, unseaworthiness, and failure to pay maintenance and cure (hereinafter, the "Pitts action"). Upon receiving notice of the suit from Fernandez, U.S. Vessels appointed David W. McCreadie, Esq. ("McCreadie") to defend Fernandez and to protect the interests of Fernandez, the F/V CAPTAIN LYMAN, and the insurance underwriters. McCreadie entered an appearance and filed an answer on Fernandez's behalf on October 22, 1998. U.S. Vessels also allegedly paid McCreadie's initial fee in the amount of $1,800 in January 1999.

On August 10, 1999, U.S. Vessels notified McCreadie that, effective August 1, 1999, it was fully dissolved and instructed McCreadie to "expend no more time or money on this matter for or on behalf of U.S. Vessel Services." U.S. Vessels further advised McCreadie that any additional correspondence on the case should be directed to the offices of LIC Liberty, in Panama City, Panama.

The Complaint alleges that despite McCreadie's efforts to communicate with

---

1. The ulna is the outer bone of the lower arm, at the wrist.

2. Osteomyelitis is defined as an "inflamation of the bone, especially the marrow, caused by a pathogenic organism." *Taber's Cyclopedic Medical Dictionary* 1187 (15th Ed.1985).

LIC Liberty, Liberty neither paid McCreadie's fees nor assisted in the preparation and coordination of Fernandez's defense to the Pitts action. McCreadie's fees in the amount of $27,646.35 went unpaid, and on November 8, 1999, McCreadie moved to withdraw as Fernandez's counsel. Fernandez opposed McCreadie's motion and offered to personally engage McCreadie as his counsel in the Pitts action, however on November 13, 1999, the Florida trial court granted McCreadie's motion to withdraw. Thereafter, on December 1, 1999, Fernandez, by counsel, tendered his defense to B. Haynie, Hill, Financial Solutions, U.S. Enterprises, and U.S. Vessels, all of whom have refused to defend him in the Pitts action. As a result, Fernandez claims to be defending the merits of that action without any assistance from his insurer.

The Complaint further alleges that Fernandez has met and exceeded his $2,500 deductible under the policy by making payments totaling approximately $15,000 for Pitts's maintenance and cure, as well as his costs and expenses in defending the Pitts action. In addition, the Complaint alleges that Fernandez is exposed to potential liability in the Pitts action for risks covered under the policy, including Pitts's alleged claims for $109,332.53 in cure, additional maintenance, and attorney's fees for failure to pay maintenance. The Complaint also alleges that Fernandez is exposed to liability for McCreadie's unpaid fee in the amount of $27,646.35, in addition to the costs of further legal action in the Pitts case. Fernandez maintains that he has fulfilled all of his obligations under the insurance policy while the Defendants collectively have failed and refused to defend him or otherwise hold him harmless from liability up to the amount of the policy limits.

Fernandez filed the instant suit in this Court on January 21, 2000, and filed an Amended Complaint on February 8, 2000. In his Amended Complaint, Fernandez asserts nine causes of action for breach of contract, breach of warranties, and negligence against B. Haynie, K. Haynie, and U.S. Enterprises. The Defendants contend, and the Plaintiff concedes, that all nine claims against B. Haynie, K. Haynie, and U.S. Enterprises stem from an alleged breach of a contract to procure and maintain a policy of marine insurance. Fernandez's Amended Complaint also asserts two causes of action for misrepresentation against Hill, U.S. Vessel Services, and J.M. Caron ("Caron"), the Director of Marketing for U.S. Vessel Services.[3]

B. Haynie, K. Haynie, and U.S. Enterprises filed the instant Motion to Dismiss for Lack of Subject Matter Jurisdiction on October 5, 2000, and filed their brief in support of that motion on October 12, 2000. The Plaintiff responded to the instant motion on October 17, 2000, and the Defendants filed their reply brief on November 1, 2000. The Court heard oral argument on the matter on November 7, 2000. Accordingly, the issues have been fully briefed and discussed and the matter is now ripe for determination.

## II. *Motion to Dismiss*

The Defendants move to dismiss this action for lack of subject matter jurisdiction. When considering a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court considers "whether plaintiff[s'] allegations, standing alone and taken as true [plead] jurisdiction and a meritorious cause of action." *Dickey v. Greene*, 729 F.2d 957, 958 (4th Cir. 1984). Once the existence of subject matter jurisdiction is challenged, the burden of establishing its existence always rests upon the party asserting jurisdiction. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir.1991), *cert. denied*, 503 U.S.

---

**3.** Defendants Hill, U.S. Vessel Services, and Caron have not made an appearance or filed an answer to Plaintiff's Complaint. Accordingly, on May 1, 2000, Plaintiff filed a Notice for Entry of Default against Hill, U.S. Vessel Services, and Caron.

984, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992). The court should regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *See id.* (citing *Adams v. Bain,* 697 F.2d 1213, 1216 (4th Cir.1982)).

## III. *Analysis*

### A. Introduction

This case raises what appears to be a novel issue both in this Court and in the Fourth Circuit: whether, in the wake of *Exxon Corporation v. Central Gulf Lines Inc.,* 500 U.S. 603, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991) (removing the *per se* exception from admiralty jurisdiction for agency contracts), an action on an alleged contract to procure marine insurance is within the grant of admiralty jurisdiction to the federal courts. In support of their Motion to Dismiss, Defendants argue that a contract to procure marine insurance such as the contract at issue in the instant case is preliminary to the actual marine insurance contract and, pursuant to the preliminary contract doctrine, such contracts fall outside the Court's admiralty jurisdiction. *See, e.g., Continental Cameras Co. v. Foa & Son Corp.,* 658 F.Supp. 287, 289 (S.D.N.Y.1987) (stating that "a contract to procure marine insurance is preliminary to the maritime contract, which is the insurance contract," and as such falls outside the court's admiralty jurisdiction). However, as more fully explained *infra, Continental Cameras* and other leading decisions on the preliminary contract doctrine predate the Supreme Court's 1991 decision in *Exxon,* and thus this Court must journey through uncharted waters within this circuit to see if a contract to procure marine insurance falls within the Court's admiralty jurisdiction post-*Exxon.* The Court is not, however, without waypoints to guide the voyage.

### B. The Origins of Admiralty Jurisdiction in Federal Courts

The first waypoint is the U.S. Constitution. The strong federal interest in—and thus federal jurisdiction over—maritime matters has existed in this country from the start and is founded upon the "important national interest in uniformity of law and remedies for those facing the hazards of waterborne transportation" and the "protection of maritime commerce." *Foremost Insurance Co. v. Richardson,* 457 U.S. 668, 677, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982); *Exxon,* 500 U.S. at 608, 111 S.Ct. 2071.

In Article III, section 2, the U.S. Constitution provides that "[t]he judicial Power [of the Supreme Court] shall extend to all Cases of admiralty and maritime Jurisdiction." *U.S. Const.,* art. III, § 2. It is of some significance that this is the only instance where the founding fathers sought fit to delegate federal jurisdiction over an entire subject matter to the federal judiciary. Today, the statutory formulation of the Constitution's grant of admiralty jurisdiction may be found at 28 U.S.C. § 1333, which provides:

> [T]he district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled. (2) Any prize brought into the United States and all proceedings for the condemnation of property taken as prize.

*Id.*

### C. Early Decisions Interpreting the Jurisdictional Grant

The second set of waypoints are the early decisions in this country giving a broad and liberal interpretation to the admiralty jurisdictional grant. While the traditional separation of admiralty jurisdiction from the common-law courts of England undoubtedly played a significant role in the decision of the founding fathers to

vest jurisdiction over admiralty and maritime matters within the federal courts, from the start our body of jurisprudence makes clear that British precedent on maritime jurisdictional issues is not determinative. On this precise issue, in an early American case that predates the ratification of the Constitution, it is said that "[t]here was a time—when we listened to the language of her Senates and her courts, with a partiality of veneration, as to oracle. It is past—we have assumed our station among the powers of the earth, and must attend to the voices of nations—the sentiments of society into which we have entered." Per Dickenson, President, High Court of Errors and Appeals, in *Talbot v. Commanders and Owners of Three Brigs*, 1 U.S. (1 Dall.) 95, 1 L.Ed. 52 (1784).

After the Constitution's ratification, our courts have read that document's grant of admiralty jurisdiction to the federal courts to be quite expansive. In 1815, Justice Story authored his famous and influential opinion in *DeLovio v. Boit*, 7 Fed.Cas. 418 (C.C.D.Mass.1815), which addressed an issue very much akin to the one facing this Court in the instant case: whether an action on a marine insurance contract fell within the grant of admiralty jurisdiction. The British admiralty courts would have been without jurisdiction over such an action unless the contract itself was executed at sea. Justice Story, however, concluded that the Constitution's jurisdictional grant warrants "the most liberal interpretation," and refers "to that maritime jurisdiction, which commercial convenience, public policy, and national rights, have contributed to establish, with slight differences, over all Europe." *Id.* at 443. Consequently, Justice Story held that a marine insurance contract fell within the constitutional grant, and that, with respect to contracts, admiralty jurisdiction "extends over all contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations) which relate to the navigation, business, or commerce of the sea." *Id.* at 444.[4]

In *New Jersey Steam Navigation Co. v. Merchants' Bank*, 47 U.S. (6 How.) 344, 12 L.Ed. 465 (1848), the Supreme Court adopted Justice Story's analysis and test for admiralty jurisdiction in contract cases, and in *New England Mutual Marine Insurance Co. v. Dunham*, 78 U.S. (11 Wal.) 1 (1871), Justice Bradley stated:

> [A]s to contracts, it has been ... well settled that the English rule which concedes jurisdiction, with a few exceptions, only to contracts made upon the sea and to be executed thereon (making locality the test) is entirely inadmissible, and that *the true criterion is the nature and subject matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions.*

*Id.* at 29 (emphasis added).

As these decisions make clear, the admiralty jurisdictional grant is to be read quite expansively, and the cases almost from the start seem to express displeasure with the bright-line jurisdictional boundaries that separated the British admiralty courts from the common-law courts. Still, in maritime contract matters, application of the "nature and subject matter test" for establishing admiralty jurisdiction has given our lower courts far more difficulty than the strict British rule that only contracts executed or performed upon the sea

4. Our courts have also deviated substantially from the traditional British rule that admiralty jurisdiction in tort actions extends only to causes of action that arose on the high seas or within the ebb and flow of tidal waters; instead, due in large part to the development of the West and the invention of the steamboat, federal courts have admiralty jurisdiction in all tort cases that arise upon "navigable waters." *See Propeller Genesee Chief v. Fitzhugh*, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851) (Taney, C.J.) (stating that "there is certainly nothing in the ebb and flow of the tide that makes the waters peculiarly suitable for admiralty jurisdiction, nor any thing in the absence of a tide that renders it unfit"); *see also Foremost Insurance Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982).

were cognizable in admiralty. As Justice Harlan observed, "[t]he boundaries of admiralty jurisdiction over contracts ... being conceptual rather than spatial, have always been difficult to draw. Precedent and usage are helpful insofar as they exclude or include certain common types of contract." *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

### D. Maritime Contract Decisions in the Lower Courts Prior to *Exxon:* The *Per Se* Exceptions from Admiralty under the Preliminary and Agency Contract Doctrines

The next set of waypoints are the numerous decisions in the lower courts prior to *Exxon* that, contrary to the Supreme Court's decision in *New England Mutual Ins. Co. v. Dunham,* 78 U.S. (11 Wall.) 1, 20 L.Ed. 90 (1870) (applying the nature and subject matter test for admiralty jurisdiction over marine contracts), created and applied the *per se* exceptions from admiralty jurisdiction under the preliminary and agency contract doctrines.

Undoubtedly, were Plaintiff in the instant case suing upon the actual marine insurance policy issued to him, this Court would have admiralty jurisdiction. *See DeLovio v. Boit,* 7 Fed.Cas. 418 (C.C.D.Mass.1815); *New England Mutual Insurance Co. v. Dunham,* 78 U.S. (11 Wall.) 1, 20 L.Ed. 90 (1870). And, prior to 1991, the law appears well-settled in the lower courts that a contract to procure marine insurance fell outside the Court's admiralty jurisdiction given the preliminary nature of such agreements. *See, e.g., F.S. Royster Guano Co. v. W.E. Hedger Co.,* 48 F.2d 86, 87 (2d Cir.1931); *Home Ins. Co. v. Merchants' Trans. Co.,* 16 F.2d

372 (9th Cir.1926); *Continental Cameras Co. v. Foa & Son Corp.,* 658 F.Supp. 287, 289 (S.D.N.Y.1987) (stating that "a contract to procure marine insurance is preliminary to the maritime contract, which is the insurance contract," and as such falls outside the court's admiralty jurisdiction). The rationale behind the preliminary contract doctrine is that services that are preliminary to, as opposed to being a part of, maritime contracts are too remote to be heard as maritime claims. *See Shipping Financial Services Corp. v. Drakos,* 140 F.3d 129, 133 (2d Cir.1998). Indeed, as stated by Judge Addison Brown over a century ago,

> [t]he distinction between preliminary services leading to a maritime contract and such maritime contracts themselves have [sic] been affirmed in this country from the first, and not yet departed from. It furnishes a distinction capable of somewhat easy application. If it be broken down, I do not perceive any other dividing line for excluding from the admiralty many other sorts of claims which it have a reference, more or less near or remote, to navigation and commerce. If the broker of a charter-party be admitted, the insurance broker must follow,—the drayman, the expressman, and all others who perform services having reference to a voyage either in contemplation or executed.

*The Thames,* 10 F. 848 (S.D.N.Y.1881).

Despite Judge Brown's admonition against the elimination of the distinction between preliminary contracts and maritime contracts, the distinction began to erode, especially with regard to what has been called a "subset" of the preliminary contract doctrine, the *per se* exception from admiralty for agency contracts.[5]

---

**5.** Agency contracts are a subset of the preliminary contract doctrine in the sense that most agency contracts are, by their nature, preliminary to the actual marine contract, while it is quite possible for a contract to fall within the preliminary contract doctrine without being an agency contract. On the question of whether the *per se* exception from admiralty for preliminary contracts predates the *per se* exception for agency contracts, the issue is much like the proverbial "chicken-or-the-egg," although Defendants in their brief credit the Supreme Court's 1855 decision in *Minturn v. Maynard,* 58 U.S. (17 How.) 477, 15 L.Ed. 235 (1855), discussed *supra,* as the starting point for both doctrines.

While some courts rigorously employed both doctrines as gatekeepers to admiralty jurisdiction, other courts became less concerned with form and, consistent with *Dunham,* examined the nature and subject matter of the contract at issue to see if the action was maritime. *Compare, e.g., Peralta Shipping Corp. v. Smith & Johnson (Shipping) Corp.,* 739 F.2d 798 (2d Cir. 1984) (holding that all general agency contracts are excluded from admiralty jurisdiction), *with Hinkins Steamship Agency, Inc. v. Freighters, Inc.,* 498 F.2d 411, 411–12 (9th Cir.1974) (*per curiam* ) (looking to the character of the work performed by a husbanding agent, and concluding that the contract was maritime because the services performed were "necessary for the continuing voyage"); *Hadjipateras v. Pacifica, S.A.,* 290 F.2d 697, 703–04, n. 15 (5th Cir.1961) (holding an agency contract for management and operation of a vessel within admiralty jurisdiction).

### E. *The Exxon Decision*

Against that backdrop, and returning to the present, the next waypoint is the Supreme Court's 1991 decision in *Exxon Corporation v. Central Gulf Lines Inc.,* 500 U.S. 603, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991). In *Exxon,* the Court faced the issue of whether admiralty jurisdiction extended to a marine fuel requirements contract in which Exxon agreed to supply fuel to a corporation's vessels, either directly at ports where Exxon had its own supplies, or by contract at those ports where Exxon had to rely on local suppliers. *See id.* at 605, 111 S.Ct. 2071. The district court for the Southern District of New York held that it could exercise admiralty jurisdiction over—and thus Exxon could assert a maritime lien for—any unpaid bills where Exxon had supplied marine fuel directly to the corporation's vessels. *See id.* at 606, 111 S.Ct. 2071. Conversely, the district court refused to exercise admiralty jurisdiction over—and thus Exxon could not assert a maritime lien for—any unpaid bills arising from ports where Exxon did not deliver the fuel directly but would instead serve as

the corporation's agent by making the necessary arrangements and paying the local supplier on behalf of the corporation. *See id.* This anomaly was the result of binding precedent in the Second Circuit that held, pursuant to the Supreme Court's 1855 decision in *Minturn v. Maynard,* 58 U.S. (17 How.) 477, 15 L.Ed. 235 (1854), that agency contracts were *per se* nonmaritime, and thus fell outside the admiralty jurisdictional grant. *See, e.g., Peralta Shipping Corp. v. Smith & Johnson (Shipping) Corp.,* 739 F.2d 798 (2d Cir.1984). Exxon appealed, and the Supreme Court ultimately granted certiorari to "determine whether the limits set upon admiralty jurisdiction in *Minturn* " and its progeny were consistent with "the fundamental interest[s] giving rise to maritime jurisdiction," mainly, the protection of maritime commerce and the desire for a uniform application of the law in maritime matters. *Exxon,* 500 U.S. at 608–09, 111 S.Ct. 2071 (citing *Sisson v. Ruby,* 497 U.S. 358, 367, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990)).

The Court characterized the contract at issue as an agency contract, and held that agency contracts were not *per se* nonmaritime. *See id.* at 611, 111 S.Ct. 2071. In so holding, the Court overruled its prior decision in *Minturn,* which held that an agent who had advanced funds for repairs and supplies necessary for a vessel could not bring a claim in admiralty against the vessel's owners. *See id.* at 610, 111 S.Ct. 2071. While *Minturn* was interpreted by lower courts as establishing a *per se* rule excluding agency contracts from admiralty, the Court noted that the two rationales supporting *Minturn* and the *per se* agency exception—that an action of assumpsit would not lie in admiralty and that in order to sue in admiralty on a contract, the claimant must have some form of a lien interest in the vessel—were no longer credible. *See id.* at 610, 111 S.Ct. 2071 (citing *Insurance Co. v. Dunham,* 11 Wall. 1 (1870) (holding that, in determining whether a contract falls within admiralty, "the true criterion is the nature and sub-

ject-matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions")). The Court held that *Minturn*'s *per se* "approach" was inconsistent with *Dunham*'s "nature and subject matter of the contract" analysis. *See id.* at 611, 111 S.Ct. 2071. Rather than apply *per se* exceptions, the Court stated that "the trend in modern admiralty case law ... is to focus the jurisdictional inquiry upon whether the nature of the transaction was maritime." *See id.* (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735–38, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); *Krauss Bros. Lumber Co. v. Dimon S.S. Corp.*, 290 U.S. 117, 124, 54 S.Ct. 105, 78 L.Ed. 216 (1933) ("Admiralty is not concerned with the form of the action, but with its substance.")). The Court instructed that, "rather than apply a rule excluding all or certain agency contracts from the realm of admiralty, lower courts should look to the subject matter of the agency contract and determine whether the services performed under the contract are maritime in nature." *Id.* at 612, 111 S.Ct. 2071.

While the Court instructed that the holding in *Exxon* "is a narrow one," and expressly declined to rule on the continuing vitality of the preliminary contract doctrine, *see id.* at 613, n. 7, 111 S.Ct. 2071,[6]

the *Exxon* opinion certainly foreshadows the death of the preliminary contract doctrine as a *per se* bar to admiralty jurisdiction in contract actions. First, the opinion expresses disfavor with bright-line jurisdictional rules in admiralty contract cases, stating that "it is inappropriate to focus on the status of a claimant to determine whether admiralty jurisdiction exists." *Id.* at 612, 111 S.Ct. 2071 (citing and quoting *Sisson v. Ruby*, 497 U.S. 358, 367, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990)) (stating that "the demand for tidy rules can go too far, and when that demand entirely divorces the jurisdictional inquiry from the purposes that support jurisdiction, it has gone too far"). Second, the death of the *per se* exception for agency contracts in *Exxon* is pillared upon the earlier death of the rationales that supported that exception, namely that an action cognizable as an assumpsit was excluded from admiralty and that a claimant had to have some form of a lien interest in a vessel to sue in admiralty on a contract. *See id.* at 610–11, 111 S.Ct. 2071. As these are some of the same rationales upon which the preliminary contract doctrine is founded, *see Benedict on Admiralty* § 185, at 12–21, *Exxon* seems to instruct that even in preliminary contract cases the subject matter of the

---

**6.** Much of the confusion surrounding the *Exxon* opinion stems from footnote 7, and the *Exxon* Court's earlier discussion in footnote 3, both of which are perhaps best appreciated in their entirety. Footnote 3 provides:

The preliminary contract rule, which excludes "preliminary services" from admiralty, was enunciated in the Second Circuit as early as 1881. *See The Thames*, 10 F. 848 (S.D.N.Y.1881) ("The distinction between preliminary services leading to a maritime contract and such contracts themselves have [sic] been affirmed in this country from the first, and not yet departed from."). In the Second Circuit, the agency exception to admiralty jurisdiction—the *Minturn* rule—has been fused with the preliminary contract doctrine. *See Cory Bros. & Co. v. United States*, 51 F.2d 1010, 1012 (C.A.2 1931) (explaining *Minturn* as involving a preliminary services contract). In denying Exxon's motion for reconsideration, the District Court declined to "disen-

tangle" the two rules, asserting that Circuit precedent had established the rule of *Minturn* "as a subset of the preliminary contract rule." 717 F.Supp. 1029, 1036 (S.D.N.Y.1989).

*Exxon*, 500 U.S. at 607, n. 3, 111 S.Ct. 2071.

The Court continues its discussion of the preliminary contract doctrine in footnote 7, which provides:

[T]he District Court regarded the services performed by Exxon ... as "preliminary" and characterized the rule excluding agency contracts from admiralty as "a subset" of the preliminary contract doctrine. This Court has never ruled on the validity of the preliminary contract doctrine, nor do we reach that question here. However, we emphasize that *Minturn* has been overruled and that courts should focus on the nature of the services performed by the agent in determining whether an agency contract is a maritime contract.

*Id.* at 613, n. 7, 111 S.Ct. 2071.

contract must be examined to see whether services performed under the contract are maritime in nature, rather than characterizing a contract as preliminary and thus *per se* outside of admiralty jurisdiction.

## F. Federal Court Decisions post-*Exxon*

The final set of waypoints are the lower federal court decisions post-*Exxon* concerning both the vitality of the preliminary contract doctrine and whether contracts to procure and maintain marine insurance are maritime contracts.

### 1. *The Preliminary Contract Doctrine*

In the wake of *Exxon,* federal courts appear to be somewhat confused on whether the preliminary contract doctrine survives *Exxon* and, if so, how it should be applied. For example, in *Venezuelan Container Line C.A. v. Navitran Corp.,* 792 F.Supp. 1281 (S.D.Fla.1991), the district court stated that it was difficult to "disentangle" the Supreme Court's holding in Exxon with respect to agency contracts from prior precedent concerning the preliminary contracts doctrine. *See id.* at 1283. Consequently, the *Venezuelan Container* court held that "[a]fter *Exxon,* it is necessary to determine if each agency agreement is maritime in nature, even if the contract is for preliminary services." *Id.* at 1283.

More recently, in *Shipping Financial Services Corp. v. Drakos,* 140 F.3d 129 (2d Cir.1998), the court noted that, in the Second Circuit, the *per se* exceptions from admiralty for preliminary contracts and agency contracts were "fused" into one line of cases, and that in the wake of *Exxon* it was unclear whether the preliminary contracts doctrine could survive. *See id.* at 133. The Court declined to reach the issue, stating

> [i]f we were to resolve the issue regarding the future of the preliminary contract doctrine, we would have to sail into uncharted waters, for we have not had occasion to write on the question of

whether a charter party brokerage contract comes admiralty jurisdiction since *Exxon* was decided. And, although *Exxon* plainly discourages *per se* exclusions to maritime claims, it stops short of entirely eliminating the preliminary contract doctrine. We pass on this opportunity because no matter which course of logic we follow, we are nevertheless drawn to the same conclusion: plaintiff has failed to show that its brokerage agreement is sufficiently maritime in nature to come within the maritime jurisdiction. Hence, we need not reach or decide the issue of whether *Exxon* precludes application of the preliminary contract doctrine. Under either the nature and subject matter analysis or the preliminary contract doctrine, this particular charter party brokerage contract fails to qualify for admiralty jurisdiction.

*Id.* at 133.

Defendants, in their brief, cite three cases in support of the continuing validity of the preliminary contract doctrine. These cases, however, are not helpful in so far as they either predate the Supreme Court's decision in Exxon or do not speak to this issue. *See* Def.'s Br. in Support of Motion to Dismiss, at 3 (stating that "courts have continued to hold that preliminary contracts do not fall within maritime jurisdiction" and citing *Maritima Petroleo E Engenharia LTDA. v. Ocean Rig 1 AS,* 78 F.Supp.2d 162, 170 (S.D.N.Y.1999); *Planned Premium Servs. of Louisiana, Inc., v. International Ins. Agents,* Inc., 928 F.2d 164 (5th Cir.1991); and *Masherah v. Dettloff,* 968 F.Supp. 336 (E.D.Mi.1997)). First, in *Maritima* the district court analyzed a charter brokerage agreement similar to that at issue in *Drakos* and, under the nature and subject matter analysis of *Exxon,* concluded that the contract was not within admiralty jurisdiction. *See Maritima,* 78 F.Supp.2d at 167–68. Second, the Fifth Circuit's decision in *Planned Premium* predates the Supreme Court's decision in *Exxon* and thus is of little

precedential value. Third, and finally, in *Masherah* the district court held that, under the *Exxon* analysis, a contract between a seafarer's union and a doctor, pursuant to which the doctor conducted annual preemployment physical examinations of seaman, was not a maritime contract within admiralty jurisdiction. *See Masherah*, 968 F.Supp. at 344. None of these cases applied the preliminary contract doctrine as a *per se* bar to admiralty jurisdiction.

### 2. Jurisdiction Over Agreements to Procure and Maintain Marine Insurance post-Exxon

Returning to the instant issue before the Court, despite the confusion over whether or not the preliminary contracts doctrine survives the *Exxon* decision, district courts that have confronted the issue of whether a contract to procure marine insurance falls within federal admiralty jurisdiction post-*Exxon* appear to have unanimously answered in the affirmative. *See Pacific Growth S.A. v. Aon Corp.*, No. 98 CIV 3594, 1999 WL 787659 (S.D.N.Y. Sept.30, 1999); *Dao v. Knightsbridge Int'l Reinsurance Corp.*, 15 F.Supp.2d 567 (D.N.J.1998); *Illinois Constructors Corp. v. Morency & Associates, Inc.*, 794 F.Supp. 841 (N.D.Ill. 1992); *Romen, Inc. v. Price–Forbes, Ltd.*, 824 F.Supp. 206 (S.D.Fla.1992).

The course that these courts have plotted in reaching this decision has not been uniform. For example, in *Illinois Constructors*, the court held that the " 'preliminary contracts rationale' cannot be divorced from the rationale which the Supreme Court rejected in *Exxon*, and thus it no longer controls the inquiry." *Illinois Constructors*, 794 F.Supp. at 843. Consequently, the court applied the *Exxon* analysis and held that

> analyzing the subject matter of the present agreement to procure marine insurance with a view toward protection of maritime commerce, the court concludes

that the agreement falls within the [federal admiralty] jurisdictional grant. The overall nature of the underlying marine insurance policy here is clearly within the admiralty jurisdiction of [federal courts]. Further, a vessel owner's use of brokers for the procurement of such insurance is not only customary but is nearly indispensable for the insured owner's benefit.

*Id.* (citing *Connecticut Fire Ins. Co. v. Davison Chem. Corp.*, 54 F.Supp. 2, 6 (D.Md.1944)).

In *Dao*, the New Jersey district court thoroughly reviewed both the pre- and post-*Exxon* decisions on the preliminary contract doctrine and contracts to procure marine insurance, and held that "the weight of authority is that an agreement to procure marine insurance is within the Court's admiralty jurisdiction." *Dao*, 15 F.Supp.2d at 575.[7] The *Dao* court held that

> this view is most consistent with *Exxon*'s prescription that the "lower courts should look to the subject matter of the agency contract and determine whether the services performed under the contract are maritime in nature." Given the historically recognized uniqueness and importance of marine insurance and maritime risks, it cannot be said that the provision of marine insurance is identical to or essentially similar to the provision of non-maritime insurance. Nor can it be said that the provision of marine insurance is not necessary to the operation, navigation, or management of a ship.

*Id.* Accordingly, the *Dao* court held that a contract to procure marine insurance was within the federal courts' admiralty jurisdiction. *See id.*

Finally, and most recently, the federal district court for the Southern District of New York had occasion to examine the issue. In *Pacific Growth S.A. v. AON Corp.*, No. 98 CIV 3594, 1999 WL 787659

---

7. It is worth noting that the insurance broker/defendants in *Dao* included some of the same defendants in the case at bar, B. Haynie and Financial Solutions.

(S.D.N.Y. Sept.30, 1999), the court, in an unreported decision, characterized the *Exxon* decision as removing the presumption that certain contracts are necessarily preliminary to maritime contracts. The *Pacific Growth* court then analogized the contract to procure marine insurance in that case to the agency agreement in *Exxon,* and held that "by their nature, insurance brokerage agreements contemplate an agency relationship" between the broker and the insured. *See id.* at \*3 (citing *Thebes Shipping, Inc. v. Assicurazioni Ausonia SPA,* 599 F.Supp. 405, 408 (S.D.N.Y.1984)) (stating that "[a]n insurance broker [is] an agent for the insured (in marine insurance, the shipowner)."). Consequently, the *Pacific Growth* court applied Exxon's subject-matter analysis and concluded that an agreement to procure and maintain marine insurance fell within the admiralty jurisdictional grant. *See id.* at \*5. The court stated:

> it appears that the subject matter of the agreement in this case was a marine insurance policy, and the subject matter of that marine insurance policy was [plaintiff's] fleet of vessels. The object of the parties' agreement was the procurement and maintenance of marine insurance coverage for [plaintiff's] fleet. In other words, it was defendants' responsibility to make sure that [plaintiff's] fleet was insured, premiums were paid, and material changes reported to the insurers. The result of defendants' alleged breach of the insurance brokerage agreement was loss of coverage and uncompensated damage to one of those vessels. The agreement between the parties cannot be divorced from the fleet itself; though its subject matter may technically have been the marine insurance policy, the insurance brokerage agreement would not have existed without the fleet, and the sole motivation for performance of duties under the agreement was the interest of protecting the fleet.

*Id.* at \*5. Accordingly, the *Pacific Growth* court held that the marine insurance bro-

kerage agreement was properly within the court's admiralty jurisdiction. *See id.*

## G. Applying the *Exxon* Analysis to the Instant Case

Returning to an analysis of the contract at bar, this Court holds that *Exxon* and its progeny plainly discourage the application of *per se* bars from admiralty jurisdiction in contract cases. Instead, *Exxon* directs that, for purposes of the jurisdictional inquiry, federal courts must examine the subject matter of the contract at issue to see whether it is maritime in nature, and should conduct this analysis with a view toward the protection of maritime commerce. *See Exxon,* 500 U.S. at 611, 111 S.Ct. 2071 (stating that "admiralty jurisdiction is designed to protect maritime commerce," and "[t]here is nothing in the nature of an agency relationship that necessarily excludes such relationships from the realm of maritime commerce").

■ The subject matter of the agreement between Plaintiff and Defendants was a marine insurance policy that, if loss ensued, would undoubtedly fall within the Court's admiralty jurisdiction. In addition, the services performed by Defendants included, *inter alia,* serving as the middleman for Plaintiff's monthly premiums and advising Plaintiff on changes to his marine insurance policy. While these services are not as salty as those performed pursuant to a contract for salvage of a vessel or a contract for towing, they are nonetheless of vital importance in today's maritime community to the success of Plaintiff's vessel and business as a going concern. *See Flagship Group, Ltd. v. Peninsula Cruise, Inc.,* 771 F.Supp. 756 (E.D.Va.1991) (MacKenzie, J.) (holding that marine insurance constitutes a "necessary" under the Federal Maritime Lien Act, and thus an insurance broker could place a lien on a vessel to enforce his right to collect an insurance premium); *see also Illinois Constructors Corp. v. Morency & Assoc., Inc.,* 794 F.Supp. 841, 843 (N.D.Ill.1992) ("The importance of insurance to maritime opera-

tions is evident in view of the devastation to maritime commerce that accidents at sea engender and the protection insurance may afford shipowners from the overwhelming costs of [accidents]."). And while Defendants attempt to attach some significance to the fact that most of Defendants' obligations under the alleged contract required performance ashore, it has long been the rule of this Court that, in maritime contract cases, "the place of performance is not controlling since contracts which relate to ships in their use as ships or to commerce or to transportation in navigable waters are clearly maritime contracts regardless of whether the contract is to be performed on land or sea." *Ford Motor Co. v. Wallenius Lines*, 476 F.Supp. 1362, 1365–66 (E.D.Va.1979) (Clarke, J.) (citing *Pierside Terminal Operators, Inc. v. M/V Floridian*, 423 F.Supp. 962, 967 (E.D.Va.1976) (Hoffman, J.)). Consequently, analyzing the matter in a manner consistent with the grant of admiralty jurisdiction—chiefly, the protection of maritime commerce—the Court holds that the contract at issue in this case falls within its admiralty jurisdiction. This decision is consistent with those of other federal admiralty courts that have addressed the same issue. Any other decision would impose an anomaly, as there would be federal admiralty jurisdiction in one state but not in another. *See Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961) (stating that, for purposes of determining jurisdiction in maritime contract cases, "[p]recedent and usage are helpful insofar as they exclude or include certain types of contracts"); *see also Benedict on Admiralty* § 185, at 12–21.

The Second Circuit's decision in *Drakos* is distinguishable from the case at bar in that the dispute in *Drakos* involved a broker's commissions allegedly earned on a subcharter contract, not the alleged failure to procure and maintain a marine insurance policy that "modern day business realities make . . . as much a necessary [to the vessel] as an anchor and propeller."

*Flagship Group, Ltd. v. Peninsula Cruise, Inc.*, 771 F.Supp. 756, 759 (E.D.Va.1991). As Judge MacKenzie noted in *Flagship*, " '[e]ven a vessel that sits at a dock without making any attempt to ply the waters must today have hull protection and indemnity insurance . . . insurance is something that every vessel today needs just to carry on its normal business,' " *id.* at 759 (quoting *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 604 (1986)). Accordingly, Judge MacKenzie held in *Flagship* that " 'because insurance is essential to keep a vessel in commerce', insurance is a necessary" under the Federal Maritime Lien Act, and unpaid insurance premiums give rise to an insurance broker's maritime lien against the vessel. *See id.*

If broker has a cause of action in admiralty against a vessel and her owner for failure to pay premiums on a marine insurance policy, *see Flagship*, 771 F.Supp. at 759, it follows that the vessel owner has a cause of action in admiralty against the broker for failure to procure and maintain a marine insurance policy. The subject matter of the alleged contract between the vessel owner and the broker is maritime in nature, and jurisdiction over the claim is consistent with the protection of maritime commerce, thus satisfying the jurisdictional inquiry for maritime contracts as set forth in *Exxon*.

Like other courts that have addressed this precise issue, this Court is also "cautious to open the courthouse doors to a surge of litigation concerning transactions that may only tangentially involve a maritime business or a ship owner merely because one is a party in the dispute." *Illinois Constructors Corporation v. Morency & Assoc.*, 794 F.Supp. 841, 843 (N.D.Ill. 1992). Accordingly, the Court counsels future litigants that desire to come within the safe harbor of admiralty jurisdiction in contract actions that the nature and subject matter of the contract at issue must be maritime, and the exercise of jurisdiction over the case must be consistent with

the purposes of the jurisdictional grant, chiefly, the protection of maritime commerce. As always, precedent will continue to play an important role in guiding courts through this analysis.

### IV. *Conclusion*

For the reasons stated herein, Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction is **DENIED**. The Clerk of the Court is **DIRECTED** to forward copies of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**